**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| MISTI COUCH, | : | Case No. 3:17-cv-90 |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | District Judge Walter H. Rice |
| | : | Magistrate Judge Sharon L. Ovington |
| | : | |
| COMMISSIONER OF THE SOCIAL | : | |
| SECURITY ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |

---

## REPORT AND RECOMMENDATIONS[1]

---

## I.  Introduction

Plaintiff Misti Couch applied for period of disability, Disability Insurance

Benefits, and Supplemental Security Income in September 2013, asserting that as of April

14, 2012, she could no longer work a substantial paid job.  The Social Security

Administration denied her claims initially and upon reconsideration.  After a hearing,

Administrative Law Judge (ALJ) Gregory G. Kenyon concluded that Plaintiff was not

eligible for benefits because she is not under a "disability" as defined in the Social

Security Act.  Plaintiff brings this case challenging the Social Security Administration's

denial of her applications for Social Security benefits.

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

The case is presently before the Court upon Plaintiff's Statement of Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #9), Plaintiff's Reply (Doc. #10), the administrative record (Doc. #6), and the record as a whole.

## II.    Standard of Review

The Social Security Administration provides Disability Insurance Benefits and Supplemental Security Income to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §§ 423(a)(1), 1382(a).  The term "disability"—as defined by the Social Security Act—has specialized meaning of limited scope.  It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job—i.e., "substantial gainful activity," in Social Security lexicon.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see Bowen,* 476 U.S. at 469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).  Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to

support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance . . . ." *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## III. __Background__

Plaintiff asserts that she has been under a "disability" since April 14, 2012. She was thirty-one years old at that time and was therefore considered a "younger person" under Social Security Regulations. *See* 20 C.F.R. §§ 404.1563(c), 416.963(c). She earned a GED—equivalent to high school education. *See id.* §§ 404.1564(b)(4), 416.964(b)(4). [2]

---

[2] The remaining citations will identify the pertinent Disability Insurance Benefits Regulations with full knowledge of the corresponding Supplemental Security Income Regulations.

## A.      Plaintiff's Testimony

Plaintiff testified at the hearing before ALJ Kenyon that she suffers from bipolar disorder.  *Id.* at 91, 94.  She experiences paranoia constantly—"[e]very time I go out of the house I think something is going to happen to me …."  *Id.* at 95.  And, 'I'm always thinking that something is going to happen in the middle of the night."  *Id.* at 97.

She is irritable on a daily basis and "go[es] off" every day.  *Id.* at 95-96.  She curses and yells at her children, husband, and strangers.  *Id.*  She assaulted her husband once.  *Id.* at 96.

Plaintiff has trouble concentrating because her mind is constantly racing.  *Id.*  She cannot focus for long enough to watch an entire movie.  *Id.*  Her racing thoughts also inhibit her ability to sleep.  *Id.*  She only sleeps for two or three hours a night and does not nap during the day.  *Id.*

Plaintiff struggles with post-traumatic stress disorder.  *Id.*  She has flashbacks a couple times a day every day.  *Id.* at 105.  She has panic attacks "a couple times a week."  *Id.* at 104.

Further, Plaintiff is depressed.  *Id.* at 97.  Twice a week, she has crying spells.  *Id.* at 98.  She isolates herself in her home and, a couple times a week, she will lock herself in her room to get away from her children.  *Id.* at 97-98, 103..  She only leaves her house to go grocery shopping and she does that at two or three in the morning to avoid other people.  *Id.* at 98.  She "eliminated all of [her friends]."  *Id.*

Plaintiff sees her psychiatrist, Dr. Rahman, once a month and he prescribes four medications:  Lexapro, trazodone, Klonopin, and Adderall.  *Id.* at 100.  She thinks he is

"[s]omewhat" helpful but that her medications need to be changed.  *Id.* at 99.

Plaintiff has migraine headaches three to four times a week.  *Id.* at 91.  They usually last half of the day.  *Id*.  She has sensitivity to both bright light and loud noises. *Id.* at 92.  She believes they are brought on by "[a] lot of stress."  *Id*.  On a scale from one to ten, she rated her pain from migraines at seven.  *Id.* at 91.  She takes Tylenol and 800-milligram ibuprofen.  *Id.* at 92.

Plaintiff also has neck, lower back, and hip pain as the result of an automobile accident in 2011 or 2012.  *Id.* at 92-93.  She described her lower back pain as a constant shooting or sharp pain.  *Id.* at 93.  On a scale from one to ten, she rated her pain as six. *Id*.  She used to take Vicodin but her doctors took her off of it.  *Id*.  In the past, she tried cortisone injections and physical therapy but neither helped.  *Id*.  Her neck pain, by comparison, is an achy pain—four or five on the ten-point scale.  *Id.* at 94.

Plaintiff lives in a house with her three children—ages 16, 11, and newborn.  *Id.* at 89.  At the time of the hearing, she had recently separated from her husband.  *Id*. However, he still came to her house to help her with the children.  *Id*.  But "[i]f he doesn't do it right then I get upset with him and go off."  *Id.* at 101.

Plaintiff is able to drive when she needs to but sometimes forgets where she is going.  *Id.* at 89.  She sometimes does not have the energy or motivation to do anything. *Id.* at 102-03.  When she is feeling up to it, she still can only do some household chores such as dishes and straightening up.  *Id.* at 102.

Between August 2014 and March 2015, she had a part-time job as a bartender, working less than 15 hours a week.  *Id.* at 90.  During that short period, she missed 30

days of work.  *Id.*  She occasionally went off on customers.  *Id.* at 99.  She also screamed at her boss and coworkers.  *Id.*  Eventually, she became stressed and "couldn't handle it anymore."  *Id.* at 90.

### B.    Medical Evidence

#### i.  Mahmood Rahman, M.D.

Plaintiff began treatment with Dr. Rahman in June 2011, and the record contains his treatment notes through September 10, 2015.  (Doc. #6 at *PageID#* 420-27, 630-67).  In his notes, Dr. Rahman consistently documented Plaintiff's mood as anxious, guarded, and sometimes labile.  On occasion, she also exhibited paucity of speech, a distractible appearance, circumstantial speech, and/or agitated psychomotor activity.  *Id.* at 424-25, 636-37.  Her symptoms included decreased energy, limited motivation, social withdrawal, irritability, angry outbursts, mood swings, racing thoughts, and insomnia.  *Id.* at 424, 659.  Dr. Rahman diagnosed bipolar disorder, attention-deficit/hyperactivity disorder (ADHD), posttraumatic stress disorder (PTSD), and a panic disorder.  *Id.* at 421, 424, 441, 632-55, 662-67.

In addition to his notes, Dr. Rahman provided four opinions regarding Plaintiff's mental impairments.  In his first opinion, on September 26, 2013, Dr. Rahman described her as having "[a] lot of emotional instability[;] disorganized thoughts[;] [and] considerable agitation."  *Id.* at 421.  Further, she had poor concentration, poor memory, and a low frustration tolerance.  *Id.* at 421.  He opined that she has "problems [with] social interactions," demonstrates poor coping skills, and is unable to tolerate stress.  *Id.*  Her daily activities are compromised and she decompensates frequently.  *Id.*

Less than one week later, on September 30, 2013, Dr. Rahman completed a mental impairment questionnaire. *Id.* at 431-34. He assigned a current Global Assessment of Functioning (GAF) score of 50 and noted 60 was her highest score in the past year. *Id.* at 431. She has many functional limitations—for instance, marked deficiencies of concentration, persistence or pace; marked episodes of deterioration or decompensation; and marked abilities to carry out very detailed instructions or maintain attention for extended periods. *Id.* at 433.

Dr. Rahman explained that she "suffers from scoliosis and back pain, the perception of which is considerably exaggerated due to severe underlying depression." *Id.* at 432. He opined that Plaintiff's prognosis was guarded and he did "not think she can work very productively. Gets overwhelmed very easily [with] stress. Decompensates quickly." *Id.* In addition, her impairments or treatment would cause her to be absent from work more than three times per month. *Id.* at 433.

Dr. Rahman completed another mental status questionnaire on May 28, 2014. *Id.* at 440-42. He described Plaintiff's speech as pressured, mood and affect as labile, concentration as impaired, and insight and judgment as compromised. *Id.* at 440. He opined that Plaintiff is "unable to tolerate stress." *Id.* at 440-42.

In his last opinion, on March 30, 2015, Dr. Rahman offered an opinion similar to his September 30, 2013 assessment. *Id.* at 655-58. In addition, he opined that Plaintiff's impairments and/or treatment would cause her to be off task for more than twenty percent of a typical work day. *Id.* at 658.

*ii.  Karla Voyten, Ph.D., & Courtney Zeune, Psy.D.*

On November 19, 2013, Dr. Voyten reviewed Plaintiff's records.  *Id.* at 141-50. She adopted the mental residual functional capacity assessment from ALJ Amelia G. Lombardo's April 2012 determination.  *Id.* at 147 (citing Acquiescence Ruling 98-4). ALJ Lombardo limited Plaintiff to "performing essentially unskilled simple tasks of a low-stress nature.  She is limited to work with no more than occasional personal contact in the workplace with coworkers, supervisors, and the general public with no fast pace or having to meet strict assembly line production quotas."  *Id.* at 127.

Dr. Zeune affirmed Dr. Voyten's assessment on April 18, 2014.  *Id.* at 163-72.

## IV.    <u>The ALJ's Decision</u>

As noted previously, it fell to ALJ Kenyon to evaluate the evidence of record in accordance with the sequential steps set forth in the Social Security Regulations.  *See* 20 C.F.R. § 404.1520.  He reached the following main conclusions:

Step 1:    Plaintiff has not engaged in substantial gainful activity since April 14, 2012.

Step 2:    She has the severe impairments of mild degenerative disk disease of the cervical spine; residuals of a lumbosacral strain; a history of headaches; a bipolar disorder; and anxiety-related disorders.

Step 3:    She does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

Step 4:    Her residual functional capacity, or the most she could do despite her impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consists of "light work … subject to the following limitations: (1) occasional crouching, crawling, kneeling, stooping, and climbing of ramps and stairs; (2) no climbing of ladders, ropes, or scaffolds; (3) no work around hazards such as unprotected heights or

dangerous machinery; (4) limited to performing unskilled, simple, repetitive tasks; (5) occasional contact with co-workers and supervisors; (6) no public contact; (7) no fast-paced production work or jobs involving strict production quotas; and (8) limited to performing jobs in a relatively static work environment in which there is very little, if any, change in the job duties or the work routine from one day to the next."

Step 4: She is unable to perform any of her past relevant work.

Step 5: She could perform a significant number of jobs that exist in the national economy.

(Doc. #6, *PageID* #s 45-54). These main findings led the ALJ to ultimately conclude that Plaintiff was not under a benefits-qualifying disability. *Id.* at 53.

## V.    <u>Discussion</u>

Plaintiff contends ALJ Kenyon erred in rejecting multiple, consistent opinions from her treating psychiatrist, Dr. Rahman. (Doc. #7, *PageID* #673).

Social Security Regulations require ALJs to adhere to certain standards when weighing treating physician's medical opinions. The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20 C.F.R. § 404.1527(c)(2)); *see Gentry*, 741 F.3d at 723.

If the treating physician's opinion is not controlling, "the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and

consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).

The Regulations also require ALJs to provide "good reasons" for the weight placed upon a treating source's opinions. *Wilson*, 378 F.3d at 544. This mandatory "good reasons" requirement is satisfied when the ALJ provides "specific reasons for the weight placed on a treating source's medical opinions." *Id.* (quoting Soc. Sec. R. 96-2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). Substantial evidence must support the reasons provided by the ALJ. *Id.*

In the present case, ALJ Kenyon set forth the correct criteria for weighing treating source opinions. He then concluded that the opinions of Plaintiff's treating physician, Dr. Rahman, "cannot be given controlling, or even deferential weight," and instead, assigned his opinions "little weight." (Doc. #6, *PageID* #51). Plaintiff, however, insists that in rejecting Dr. Rahman's opinions, "ALJ Kenyon entirely fails to apply the correct legal framework …." (Doc. #7, *PageID* #675).

The ALJ did provide some reasons for not giving Dr. Rahman's opinions controlling weight. He found, "On the questionnaire, the claimant reported a Global Assessment of Functioning (GAF) score of 50; however, that is inconsistent with the treatment notes, which consistently showed a GAF score of 60, which would not preclude competitive employment." (Doc. #6, *PageID* #51) (internal citations omitted). The ALJ acknowledges that "[a] GAF score of 50 was reported only on September 19, 2013, but this appears to have been altered from 50 to 60 after the fact." *Id.* (internal citations omitted).

The ALJ's reliance on these GAF scores is flawed. As an initial matter, individuals do not report their GAF scores—"a GAF score is 'a subjective determination that represents the *clinician's judgment* of the individual's overall level of functioning.'" *Oliver v. Comm'r of Soc. Sec.*, 415 F.App'x 681, 684 (6th Cir. 2011) (emphasis added) (quoting *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009)). Thus, Dr. Rahman determined Plaintiff's GAF scores—Plaintiff did not provide her own lay opinion about her GAF scores.

Additionally, substantial evidence does not support the ALJ's finding that Dr. Rahman's treatment notes were altered after the fact. While the ALJ is correct that the number in Dr. Rahman's treatment note appears to have been overwritten or changed, the ALJ does not provide any support for his conclusion that it was changed "after the fact" nor does he identify who would have changed it. And, there is no evidence in the record to suggest it was changed after the fact, let alone for an improper purpose. Thus, it is not reasonable to infer that Dr. Rahman's treatment notes were changed to match his opinion.

It then follows that the ALJ's conclusion that the GAF scores were inconsistent is also unsupported by substantial evidence. Dr. Rahman's note from September 19, 2013 indicating Plaintiff's GAF score was 50 is consistent with his opinion less than two weeks later that her *current* GAF score was 50.

ALJ Kenyon also discounted Dr. Rahman's opinion because "Mental status examinations were consistently normal, except for the claimant's mood." (Doc. #6, *PageID* #51) (citing Exh. B12F, pgs. 3-9, 13, 15, 19-25 [Doc. #6, *PageID* #s 632-38, 642, 644, 648-54]). This statement, however, is misleading. The clinical notes of Dr.

Rahman do not indicate that the specific mental status examination findings were "normal;" instead, it appears he simply did not check any box. Plaintiff correctly observes that the absence of a checkmark on these treatment notes is not genuinely inconsistent with Dr. Rahman's opinions. Importantly, the treating physician rule does not require that an opinion "be consistent with all the other evidence[,] as long as there is no other substantial evidence in the case record that contradicts or conflicts with the opinion." Soc. Sec. R. 96-2p, 1996 WL 374188, at *3 (Soc. Sec. Admin. July 2, 1996). Dr. Rahman's lack of checkmarks in some of his treatment notes does not contradict or conflict with his opinions.

Further, although the ALJ is quick to discard Dr. Rahman's notes concerning Plaintiff's mood, it is not reasonable to do so. Dr. Rahman's diagnosed bipolar II disorder—a "mood disorder"[3]—and accordingly, his notes concerning her moods are particularly relevant. His notes consistently indicated that Plaintiff's mood was anxious, guarded, and/or labile. (Doc. #6, *PageID* #s 426-27, 435, 632-37, 649-54). Moreover, Dr. Rahman documented that Plaintiff exhibited, for example, psychomotor agitation, circumstantial speech, and paucity of speech. *See id.* at 424-25, 633-38, 642-44, 648-54.

The ALJ provided one last reason for discrediting Dr. Rahman's opinions: "his treatment notes consistently indicate that she was noncompliant with treatment." *Id.* at 51 (internal citations omitted). However, he does not elaborate on how that reflects on

---

[3] "If you have a mood disorder, your general emotional state or mood is distorted or inconsistent with your circumstances and interferes with your ability to function. …" *Mood Disorders*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/mood-disorders/symptoms-causes/syc-20365057 (last visited July 12, 2018). Bipolar disorder is an example of a mood disorder. *Id.*

Dr. Rahman's opinions. To the extent the ALJ equates the gaps in treatment to either improvement in Plaintiff's symptoms or the non-restricting impact these impairments have on her ability to work, he lacks substantial supporting evidence. "ALJs must be careful not to assume that a patient's failure to receive mental-health treatment evinces a tranquil mental state. For some mental disorders, the very failure to seek treatment is simply another symptom of the disorder itself." *White*, 572 F.3d at 283 (citing *Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009)); *see Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989) ("it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation"). This is particularly so in the present case where the record often indicates that Plaintiff had poor insight and judgment. *See*, *e.g.*, Doc. #6, *PageID* #s 421, 431, 440. In sum, substantial evidence does not support ALJ Kenyon's reasons for not giving Dr. Rahman's opinions controlling weight and, thus, they do not constitute good reasons.

However, even if ALJ Kenyon was correct that Dr. Rahman's opinions are not entitled to controlling weight, "in all cases there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference, its non-controlling status notwithstanding." *Rogers*, 486 F.3d at 242 (citation omitted); *see Gayheart*, 710 F.3d at 376; Soc. Sec. R. 96-2P, 1996 WL 374188, at *4 (Soc. Sec. Admin. July 2, 1996) ("Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927.").

ALJ Kenyon did not address the factors. For example, he did not acknowledge that Dr. Rahman has treated Plaintiff for several years; he first evaluated Plaintiff in June 2011 and began regularly treating her in March 2012. *See* 20 C.F.R. § 404.1527(c)(2)(i). Further, since March 2012, he saw her almost once a month. *See id.* ("When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the medical source's medical opinion more weight than we would give it if it were from a nontreating source."). Although the ALJ recognized that Dr. Rahman is a psychiatrist, he does not appear to have considered it in assigning his opinions little weight. 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist."). Likewise, the ALJ does not recognize that Dr. Rahman not only provided explanations in his opinions (when asked for an explanation), he also provided treatment notes that identify specific signs and symptoms which support his opinions. *See* 20 C.F.R. § 404.1527(c)(3) ("The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion.").

ALJ Kenyon's failure to adequately address the treating physician rule combined with his failure to address any of the factors constitutes error. "[A]n ALJ's 'failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight' given '*denotes a lack of substantial evidence,* even where the conclusion of the ALJ may be justified based upon the record.'" *Blakley*, 581 F.3d at 407 (quoting *Rogers*, 486 F.3d at 243); *see* Soc.

Sec. R. 96-2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996) ("[T]he notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion ….").

ALJ Kenyon also failed to adequately weigh the record reviewing psychologists' opinions. He correctly observes that they adopted the previous mental residual functional capacity assessment of ALJ Lombardo. But he does not assign any weight to their opinions and does not address any of the factors. Instead, he concludes that he is not bound by the previous ALJ's mental residual capacity because "there is new and material evidence regarding the claimant's physical and mental impairments that supports the need for some additional nonexertional work restrictions." (Doc. #6, *PageID* #50). He does not, however, identify the new evidence or when it was added to the record. This is significant because he also does not indicate whether the evidence was received before or after the State agency psychologists' review. Thus, it is not clear if the ALJ relied on their opinions in part or rejected them in part. ALJ Kenyon's failure to weigh the psychologists' opinion constitutes error because "[u]nless a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant…." 20 CFR § 404.1527(e)(2)(ii). And, in this case, where no other examining physician provided an opinion on Plaintiff's mental impairments and only the State agency record-reviewing psychologists' opinions conflict with Dr. Rahman's, it is particularly troubling that the ALJ devoted so little attention to their opinions.

Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.[4]

## VI.  Remand

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746. Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff lacks credibility, *see Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

---

[4] In light of the above discussion, and the resulting need to remand this case, an in-depth analysis of Plaintiff's other challenges to the ALJ's decision is unwarranted.

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and the evidence of disability is not strong while contrary evidence is lacking. However, Plaintiff is entitled to an Order remanding this case to the Social Security Administration pursuant to sentence four of § 405(g) due to the problems discussed above. On remand, the ALJ should be directed to evaluate the evidence of record, including the medical source opinions, under the applicable legal criteria mandated by the Commissioner's Regulations and Rulings and by case law; and to evaluate Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether Plaintiff was under a disability and whether her applications for Disability Insurance Benefits and Supplemental Security Income should be granted.

**IT IS THEREFORE RECOMMENDED THAT**:

1. The Commissioner's non-disability finding be vacated;

2. No finding be made as to whether Plaintiff Misti Couch was under a "disability" within the meaning of the Social Security Act;

3. This matter be **REMANDED** to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Report and Recommendations, and any decision adopting this Report and Recommendations; and

4. The case be terminated on the Court's docket.


July 19, 2018                                    *s/Sharon L. Ovington*
                                                Sharon L. Ovington
                                                United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).